## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. ____26-cv-952_____

NEWMONT CORPORATION,

      Plaintiff,

and

CRIPPLE CREEK & VICTOR GOLD MINING
COMPANY, LLC,

      Nominal Plaintiff,

v.

COLORADO DEPARTMENT OF PUBLIC
HEALTH AND ENVIRONMENT and COLORADO
WATER QUALITY CONTROL DIVISION,

      Defendant.

---

## COMPLAINT FOR DECLARATORY RELIEF

---

Plaintiff Newmont Corporation ("Newmont") brings this action against Defendants Colorado Department of Public Health and Environment ("Department") and Colorado Water Quality Control Division ("Division") seeking a declaration that federal and state law do not require a discharge permit for water outflows from the Carlton Tunnel to Fourmile Creek in Teller County, Colorado. Cripple Creek & Victor Gold Mining Company, LLC ("CC&V," and collectively with Newmont, "Plaintiffs") appears as a Nominal Plaintiff. In support of the claims and request for declaratory relief, Plaintiffs state as follows:

1

## INTRODUCTION

1.      Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, Plaintiffs seek a declaratory judgment that neither federal nor state law requires a discharge permit for the Carlton Tunnel. The Carlton Tunnel and the Portal through which it discharges are located in Fourmile Creek Canyon in Teller County, Colorado, near the Cripple Creek Mining District.

2.      Although Plaintiffs have consistently maintained that no permit is required for the discharge from the Carlton Tunnel, they have worked assiduously with Defendants for years to reach the terms of the current permit, issued February 25, 2026. During the pendency of this litigation regarding whether a permit is required, Plaintiffs intend to abide by the terms and schedules in the current permit and fully cooperate with Defendants in implementation of the permit.

3.      The Carlton Tunnel was constructed from 1939 to 1941 to manage underground water in the Cripple Creek Mining District. The approximately 6.5-mile-long underground tunnel conveys water from the permeable volcanic rock to the Carlton Portal, where the water empties into Fourmile Creek after flowing through six settling ponds. The Carlton Portal is located on property owned by Nominal Plaintiff CC&V, which is a former Newmont subsidiary.

4.      There is a CC&V surface mining operation in the Cripple Creek Mining District, but studies conducted by the Division and by Plaintiffs have shown that the surface mining activities do not have any effect on the quality of the water that empties into Fourmile Creek from the Carlton Tunnel. There are no other ongoing mining operations in the vicinity of the Carlton Tunnel that could have any impact on water quality. And the flow of water through the Carlton Tunnel is controlled by gravity and not subject to CC&V control.

2

5.     Since 1977, the Division nonetheless has claimed that a discharge permit is required for the Carlton Tunnel, pursuant to the federal Clean Water Act and the Colorado Water Quality Control Act. The currently operative discharge permit for the Carlton Portal is attached as an exhibit to this Complaint.[1]

6.     Plaintiffs disagree and have expressly reserved the right to challenge whether a permit is required. Newmont has managed the permitting relationship with the Division on behalf of CC&V, which is a former Newmont subsidiary, from the time it acquired CC&V. For decades, Plaintiffs have made efforts to collaborate with the Division on permit terms and compliance even though Plaintiffs have consistently maintained that no discharge permit is required under federal and state law. As a result, Plaintiffs and the Division have in several instances come to agreement on permit terms without needing to resort to litigation over whether a permit is required in the first instance.

7.     However, the Division recently has sought to impose new permit requirements that may be technologically, environmentally, and economically infeasible. Those requirements include compliance with stringent discharge limits on multiple pollutants—even though they are naturally occurring, have not been added to the water by any person or entity, have not impaired downstream fish or macroinvertebrate populations, and have not resulted in any downstream

---

[1] Exhibit A is the initial renewal permit for the Carlton Tunnel, CDPS Permit No. CO0024562, issued on January 29, 2021 (hereinafter *2021 Renewal Permit*); Exhibit B is the Division's associated permit "Fact Sheet" issued on the same date (hereinafter *2021 Fact Sheet*); Exhibit C is the currently operative corrected permit modification, dated February 25, 2026 (hereinafter *2026 Permit Modification*); Exhibit D is the Division's permit "Fact Sheet" for the currently operative permit modification (hereinafter *2026 Fact Sheet*); and Exhibit E is the Division's "Fact Sheet" for the corrected permit modification. (Historical permit documents are available online at the citations in footnotes below and also at https://tinyurl.com/ehdmtuus.)

exceedances of primary drinking water standards.

8.      The onerous permit requirements that the Division is attempting to impose render compliance potentially infeasible and economically unviable. The only way that Plaintiffs could comply with these discharge limits would be to construct an incredibly costly reverse osmosis water treatment plant.

9.      Initially, the Division insisted that Plaintiffs build a plant at the Tunnel discharge. However, the Carlton Portal is accessible only via an unpaved, narrow, high-country road with hairpin turns, steep grades and drop-offs, winter closures, and frequent avalanche risk. The road cannot be improved due to its designation as a national and state Scenic Byway and Teller County's road design requirements. Indeed, the Division has now acknowledged that the remote location and the unique characteristics of the water that flows to Fourmile Creek from the Carlton Tunnel make unworkable the construction, operation, and servicing of the immensely costly water treatment plant at the Carlton Portal.

10.     Thus, to comply with the discharge limits the Division now is attempting to impose for the first time in nearly 50 years, Plaintiffs would have to build a water treatment plant miles away, construct a bulkhead at the Carlton Tunnel, pump the water to the treatment plant, and then discharge the water at an alternative location on Fourmile Creek or one of its tributaries upstream of the Portal,[2] which would impact downstream water flow, water usage, and water rights.

11.     The Division's recent and unreasonable change in posture from requiring monitoring of the Tunnel discharge to requiring extremely onerous water treatment is what has

---

[2] *See* Exhibit D, *2026 Fact Sheet* 22-23.

precipitated this lawsuit and requires that the question of whether a permit is necessary be litigated in court.

12.     Federal law does not require a discharge permit for the Carlton Tunnel. The Clean Water Act requires a discharge permit only where there has been an "addition" of pollutants to the waters of the United States from a point source. 33 U.S.C. §§ 1311, 1362(7), (12). For at least three reasons, there is no "addition" of pollutants to the waters of the United States from the Carlton Tunnel.

13.     *First*, under the Water Transfers Rule promulgated by the United States Environmental Protection Agency ("EPA"), 40 C.F.R. § 122.3(i)—a rule that follows from the ordinary meaning of the statutory term "addition"—no discharge permit is required for "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use."

14.     The Water Transfers Rule applies here. The Carlton Tunnel is a water of the United States because it is a relatively permanent stream functioning as a tributary to Fourmile Creek. Any pollutants in the water flowing into Fourmile Creek at the Carlton Portal are not an "addition" of pollutants to the waters of the United States. Rather, the flow of any such pollutants at the Carlton Portal is a water transfer between the Carlton Tunnel and Fourmile Creek.

15.     *Second*, there is an "addition" of pollutants to the waters of the United States only where the presence of the pollutants was caused by human activity. If pollutants occur naturally and are not caused by human activity, there is no "addition" of pollutants. That is the case here. The constituents of concern identified by the Division in the water emptying from the Carlton Tunnel occur naturally as a result of the geology of the region where the Carlton Tunnel is located.

The particles have not been added to the water through any action by any person or entity, and there is no evidence that current or historic mining activities contribute to the levels of those constituents in Fourmile Creek.

16.     *Third*, there is no "addition" of pollutants to the waters of the United States where the source water and receiving water are not "meaningfully distinct" or the water "simply flows from one portion of [a] water body to another." *L.A. Cnty. Flood Control Dist. v. Nat. Res. Def. Council, Inc.*, 568 U.S. 78, 83 (2013). That is the case here. Even if the Carlton Tunnel had never been built, the underground water from the permeable volcanic rock would ultimately flow through seeps and springs to Fourmile Creek. Accordingly, the underground water is not meaningfully distinct from the water in the Fourmile Creek, and for that reason too, there is no addition of pollutants to Fourmile Creek from the Carlton Tunnel.

17.     Similarly, Colorado law does not require a discharge permit. Like federal law, Colorado law requires discharge permits only when there has been an "introduction or addition of a pollutant" to state waters. Colo. Rev. Stat. § 25-8-103(3). As under federal law, there is no "addition" of pollutants to state waters when pollutants are moved around within state waters, with no intervening use; nothing new is "introduced" into state waters. And Colorado law expressly exempts from discharge-permitting requirements any "discharge, carriage, [or] exchange of water from or into" state waters "in the exercise of water rights." *Id*. § 25-8-503(5). For all the reasons set out above, the outflows from the Carlton Tunnel do not involve any addition of pollutants.

18.     There is a real and justiciable controversy between the parties over whether a permit is required for the Carlton Tunnel, and whether Colorado could bring a Clean Water Act citizen-suit action or otherwise enforce the permit. It is appropriate for this Court to issue declaratory relief

to resolve that controversy.

## THE PARTIES

19.     Plaintiff Newmont Corporation is a Delaware corporation with its principal place of business in Denver, Colorado. Newmont is the former sole shareholder of Newmont CC&V Mining Corporation ("Newmont CC&V"). Newmont CC&V was the sole member of GCGC LLC ("GCGC") and held all of the issued and outstanding membership interests in GCGC. Newmont CC&V and GCGC were the sole members of CC&V. In December 2024, Newmont agreed to sell all of its shares in Newmont CC&V to a third party. The sale closed in March 2025 with the execution of a Share Purchase Agreement.

20.     Newmont no longer has any ownership interest in CC&V, but as part of the Share Purchase Agreement, Newmont reserved the right to "lead the pursuit of the Carlton Tunnel Regulatory Relief," which includes this lawsuit. Under the Share Purchase Agreement, Newmont is responsible for constructing the water treatment plant if Carlton Tunnel Regulatory Relief is not obtained. Accordingly, Newmont bears a substantial risk that it will bear compliance costs for the permit requirements the Division is attempting to impose.

21.     Nominal Plaintiff CC&V is a Colorado limited liability company with its principal place of business in Denver, Colorado. The property where the Carlton Portal is located is owned by CC&V, and a permit was issued to CC&V by the Division for outflows from the Carlton Tunnel to Fourmile Creek. CC&V is a Nominal Plaintiff in this action because Newmont is the party that has managed the permitting relationship with the Division and that bears a substantial risk of compliance costs for permit requirements imposed by the Division. Newmont retained the rights to pursue this litigation through the Share Purchase Agreement. Accordingly, CC&V appears in

this action as a "Nominal Plaintiff."

22.     Defendant Colorado Water Quality Division is a division of Defendant Colorado Department of Public Health and Environment. The Division has the delegated authority to issue Clean Water Act permits for discharging pollutants through a point source into waters of the United States. The Division is also responsible for implementing Colorado's Water Quality Control Act. The Division issued the discharge permit for the Carlton Tunnel to CC&V, despite the fact that no permit is required. As a condition of that permit, the Division is currently seeking to impose new, costly, and potentially infeasible requirements to comply with water quality standards for outflows from the Carlton Tunnel to Fourmile Creek.

## JURISDICTION AND VENUE

23.     Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, this Court may declare the rights of any interested party in a case involving an actual federal controversy between parties within its jurisdiction. There is an actual federal controversy between interested parties over whether a permit is required for outflows from the Carlton Tunnel to Fourmile Creek under the Clean Water Act.

24.     Plaintiffs have been injured and are at substantial risk of further injury from the Division's actions. If a permit is legally required, the Carlton Tunnel would be extremely affected and many tens of millions of dollars would have to be expended to attempt to construct, operate, and service a new water treatment plant in a remote location far from the Carlton Portal to comply with the Division's new conditions, or else there could be enforcement or citizen-suit actions and penalties. *See* 33 U.S.C. §§ 1319(a)-(d), 1365(a)(1); Colo. Rev. Stat. §§ 25-8-601 *et seq*. A declaratory judgment that the Clean Water Act and Colorado Water Quality Control Act do not

require a permit for flows from the Carlton Tunnel to the Fourmile Creek would resolve the parties' controversy. The Court thus may award such declaratory relief.

25.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs are bringing claims that arise under federal law, including the Clean Water Act. The Court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the claims arising from the Colorado Water Quality Control Act, and plenary jurisdiction because those claims are intertwined with Plaintiffs' federal claims.

26.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because the Division is deemed to reside in the District of Colorado and a substantial part of the events or omissions giving rise to the claims herein occurred in the District of Colorado.

## STATUTORY AND REGULATORY FRAMEWORK

### A.    Clean Water Act

27.    The Clean Water Act, 33 U.S.C. § 1251 *et seq.*, is the comprehensive federal law regulating discharges of pollutants into waters of the United States.

28.    The Clean Water Act generally prohibits "the discharge of any pollutant by any person" "[e]xcept as in compliance with" specified statutory provisions. 33 U.S.C. § 1311(a). The Clean Water Act defines a "discharge" to mean "any addition of any pollutant to navigable waters from any point source." *Id.* § 1362(12). The term "navigable waters" means "the waters of the United States." *Id.* § 1362(7). A "point source" is "any discernible, confined and discrete conveyance . . . from which pollutants are or may be discharged." *Id.* § 1362(14). The Clean Water Act imposes "crushing" consequences for violations of the discharge prohibition, "even for inadvertent violations." *Sackett v. EPA*, 598 U.S. 651, 660 (2023).

29.    One provision with which a person may comply to avoid the discharge prohibition is 33 U.S.C. § 1342. Section 1342 establishes the National Pollutant Discharge Elimination System ("NPDES") permit system and provides that a person may discharge pollutants from a point source if that discharge complies with the terms of a NPDES permit. 33 U.S.C. § 1342(a)(1); *see generally City & Cnty. of S.F. v. EPA*, 145 S. Ct. 704, 711-712 (2025). NPDES permits generally are effective for five-year terms. *See* 40 C.F.R. § 122.46.

30.    The Clean Water Act only requires a person to obtain an NPDES permit if there is a covered discharge of pollutants to the waters of the United States from a point source.

31.    Certain discharges are categorically excluded from the NPDES permit requirement under EPA's regulations implementing the Clean Water Act. In particular, under EPA's Water Transfers Rule, "[d]ischarges from a water transfer" do not require a NPDES permit. 40 C.F.R. § 122.3(i). "Water transfer" means "an activity that conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use," and without "introduc[ing] [pollutants] . . . to the water being transferred." *Id.* For purposes of the Water Transfers Rule, "waters of the United States" include traditional navigable waters as well as "[t]ributaries" of such waters that are "relatively permanent, standing or continuously flowing bodies of water." *Id.* § 120.2(a)(3); *see Sackett*, 598 U.S. at 671 (the "waters of the United States" encompass "those relatively permanent . . . flowing bodies of water forming geographic[al] features that are described in ordinary parlance as streams . . ." (internal quotation marks omitted)).[3]

---

[3] The Environmental Protection Agency and U.S. Army Corps of Engineers have published for comment a proposed rule to define "waters of the United States" in conformity with the Supreme

32.     Water transfers are not subject to the Clean Water Act's NPDES permit requirement because they do not add any pollutant to the waters of the United States. *See* 33 U.S.C. § 1362(12). The "waters of the United States" is a unitary concept. It follows that once a pollutant is in the "waters of the United States," moving it around within waters of the United States does not involve an "addition" of a pollutant. Any "pollutant at issue is already part of 'the waters of the United States' to begin with." NPDES Water Transfers Rule, 73 Fed. Reg. 33697, 33701 (June 13, 2008). "[T]hus nothing is added to those waters from the outside world." *Id.*

33.     The Clean Water Act likewise does not require a NPDES permit in other circumstances where it has not been shown that there is an "addition" of any pollutant. 33 U.S.C. § 1362(12). The "presence" of a pollutant "in the water" does not qualify as an "addition" unless it "is caused by human action and it did not otherwise naturally occur in the water to the same degree." *Sierra Club v. CC&V*, 2006 WL 2882491, at *16 (D. Colo. Apr. 13, 2006) (finding that the plaintiff failed to demonstrate claimed violations of the Clean Water Act by CC&V related to Carlton Tunnel due to lack of evidence that "any pollutant ha[d] been added or discharged into the water"); *see* 33 U.S.C. § 1362(19) ("pollution" is the "*man-made* or *man-induced* alteration of the chemical, physical, biological, and radiological integrity of water" (emphases added)).

34.     Moreover, no addition of a pollutant occurs, and no NPDES permit is required, when water is transferred between "two hydrologically indistinguishable parts of a single water body." *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95, 109 (2004); *see also Cottonwood Env't L. Ctr. v. Edwards*, 86 F.4th 1255, 1263 (9th Cir. 2023) (holding that an

---

Court's *Sackett* decision. Updated Definition of "Waters of the United States," 90 Fed. Reg. 52498 (Nov. 20, 2025).

"underdrain pipe alone cannot constitute the discharge of a pollutant" when the source water "would reach" the receiving water "regardless of the existence of the underdrain pipe").

35.     The EPA has delegated to many States, including Colorado, the authority to oversee a NPDES permit program and to issue NPDES permits pursuant to the Clean Water Act. 40 Fed. Reg. 16713, 16713 (Apr. 14, 1975).

**B.     Colorado Water Quality Control Act**

36.     In addition to implementing the federal NPDES permit program, Colorado has authority to regulate discharges under the Colorado Water Quality Control Act, Colo. Rev. Stat. § 25-8-101 *et seq*.

37.     The Colorado Water Quality Control Act requires a permit for any person to "discharge any pollutant into any state water from a point source." Colo. Rev. Stat. § 25-8-501(1).

38.     As under the Clean Water Act, the Colorado Water Quality Control Act's permit requirement is triggered only when there is an "introduction or addition of a pollutant" to state waters. Colo. Rev. Stat. § 25-8-103(3). As a result, water transfers among waters of the State are exempt from permit requirements under the Colorado Water Quality Control Act, because water transfers do not involve any introduction or addition of a pollutant to state waters.

39.     The Colorado Water Quality Control Act also expressly exempts from permit requirements any "[a]ctivities such as diversion, carriage, and exchange of water from or into streams, lakes, reservoirs, or conveyance structures . . . , in the exercise of water rights." Colo. Rev. Stat. § 25-8-503(5); *see also* 2 Colo. Code Regs. § 402-8:4.3(11); 5 Colo. Code Regs. § 1002-61:61.3(1)(a).

## FACTS

A.     **The Carlton Tunnel and Portal Were Constructed to Convey Underground Water Beneath Historic Mining Sites to Fourmile Creek**

40.     The Cripple Creek Mining District is located in central Colorado, approximately 19 miles southwest of Colorado Springs.

41.     There were gold mining operations in the Cripple Creek Mining District starting in the 1890s. Until the mid-20th century, mining was predominantly conducted underground.

42.     The gold deposits were located in a volcanic diatreme, which is a cone-shaped rock formation created by volcanic activity that spans approximately seven square miles. The diatreme is composed of fragmented volcanic rocks surrounded by less permeable granite. The granite acts like a container for the volcanic rock, which becomes saturated with regional groundwater from precipitation and snow melt. As was observed in 1906, "the underground water of the central part of the Cripple Creek district is to be regarded . . . as an underground lake or pond bounded by the steep walls of the old volcanic throat."[4]

43.     As mines grew deeper and encountered underground water, tunnels were constructed at successively lower elevations to divert water, lower the water table, and facilitate further mining.

44.     The Carlton Tunnel was constructed between 1939 and 1941 to manage water 3,000 feet below surface level. It is 6.5 miles long and uses gravity to convey water from the diatreme to the Carlton Portal. At the Portal, water empties and is transferred from the Carlton Tunnel to

---

[4] Waldemar Lindgren & Frederick Leslie Ransome, *Geology and Gold Deposits of the Cripple Creek District, Colorado* 238 (Gov't Printing Office 1906).

Fourmile Creek after flowing through six settling ponds that remove solids. Figure 1 below depicts the Carlton Tunnel in red and the boundaries of the diatreme in green. Figure 2 below is a recent photograph of the Carlton Tunnel.



**Figure 1 – Map of Carlton Tunnel and Volcanic Diatreme**



**Figure 2 – Photograph of Carlton Portal**

45.    There is a relatively permanent flow of water through the Carlton Tunnel. Over the past twenty years the flow rate has averaged approximately 1,200 gallons of water per minute and ranged up to 1,800 gallons of water per minute.

46.    Without the Carlton Tunnel, water flowing underground through the Tunnel would naturally percolate from the diatreme to Fourmile Creek through seeps and springs. Indeed, according to court records, up to four cubic feet per second of water that flows through Carlton Tunnel naturally flowed to Fourmile Creek before the Tunnel was constructed.[5] Four cubic feet per second is equivalent to approximately 1,800 gallons per minute—the maximum flow rate for the Carlton Tunnel over the past twenty years.

47.    Thus, there is no evidence that the change in route from seeps and springs to the Carlton Tunnel has impacted the level of alleged pollutants in Fourmile Creek.

**B.    Pollutants are Not Added to the Water in the Carlton Tunnel by any Person or Entity, and the Flow of the Water is Not Controlled by CC&V.**

48.    The property where Carlton Portal is located is owned by CC&V as part of a small, 30-acre parcel.

49.    The flow of water through the Carlton Tunnel is not controlled by CC&V.

---

[5] *See* Decree 2, *In the Matter of Adjudication of Priorities to the Use of Water in Water District No. 12*, No. 5648 (Colo. Dist. Ct. Freemont Cnty. July 7, 1942) (reciting that before the Carlton Tunnel was constructed, water in the underground diatreme "escaped therefrom . . . in low places, and to some extent by seepage through small fissures, fractures and veins in the granite and returned to the stream into which the Carlton Tunnel discharges" (*i.e.* Fourmile Creek); that such water "was a part of the flow of said stream, and as such has long since been appropriated and applied to the beneficial irrigation of lands"; and that "Engineers testifying in this proceeding estimated the flow of said . . . water . . . as little as 1.4 cubic feet per second and others at as much as three cubic feet per second, but that petitioner is willing to have four cubic feet per second deducted from the water to be awarded petitioner as belonging to the stream").

50.     Since 1994, surface mining activities, known as the Cresson Project, have been conducted by CC&V in the Cripple Creek Mining District approximately 6.5 miles from the Carlton Portal.

51.     Those activities do not take place in the area served by the Carlton Tunnel, and CC&V has not taken any action that impacts the flow or quality of water through the Carlton Tunnel.

52.     Studies performed by the Division and by Plaintiffs have confirmed that the surface mining activities do not affect water quality in the Carlton Tunnel. Those studies reviewed Carlton Tunnel water quality data from 1988-2011 and compared data from before and after the Cresson Project. The studies concluded that, for parameters for which there was available data, there was no statistical difference in water quality before and after the Cresson Project. Based on those studies, the Division acknowledged in 2021 "that the active surface mining activities are not currently influencing the pollution discharged from the historic area."[6]

53.     No one has entered the Carlton Tunnel since the mid-1980s. A recent partial tunnel collapse near the Portal entrance shown in Figures 3 and 4 below has impeded efforts to investigate the condition of the Tunnel.

---

[6] Exhibit B, *2021 Fact Sheet* 8.



**Figure 3 – Overhead View of Collapse at Tunnel Entrance**



**Figure 4 – Collapse Inside Carlton Tunnel**

54.     The Division has identified certain constituents in the water that enters Fourmile Creek from the Carlton Tunnel. Those include aluminum, iron, manganese, fluoride, sulfate, and arsenic. In 2021, the Division concluded that levels of those constituents in water flowing from

the Carlton Tunnel exceeded applicable regulatory effluent limits.[7] The Division further concluded that the water does not meet applicable regulatory limits on effluent toxicity.[8]

55.    However, the constituents identified by the Division occur naturally as a result of the geology of the area. Studies submitted to the Division have confirmed that such constituents in water in the diatreme derive from natural processes of oxidation acting on the rocks and minerals in ore deposits.[9] As was observed as early as 1906: "[S]ulfides in the ore body become oxidized and release iron and sulfate to the water. Some of the manganese remains in solution and fluorite is partially dissolved in water, contributing calcium and fluoride. Aluminum is partially dissolved from the acid breakdown of aluminosilicate minerals."[10] Those naturally occurring constituents are not added to the water in the Carlton Tunnel by any person or entity. There also is no evidence that either current or historic mining activities contribute to the levels of those contaminants in the Fourmile Creek.

56.    The levels in Fourmile Creek are similar downstream and upstream of the Carlton Portal and elsewhere in the area for some constituents. For instance, fluoride levels in Fourmile Creek are similar downstream and upstream of the Carlton Portal, and are attributable to naturally elevated regional concentrations of fluoride.[11] Moreover, fluoride levels in drinking water downstream of the Carlton Tunnel have not exceeded EPA's primary drinking water standards for

---

[7] *See* Exhibit B, *2021 Fact Sheet* 11-15.

[8] *See* Exhibit B, *2021 Fact Sheet* 15.

[9] *See* Geosyntec Alternatives Analysis 34-41, Proponent Prehearing Statement of CC&V Exhibit 6, 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Feb. 19, 2025) (hereinafter *Geosyntec Alternatives Analysis*), *available at* https://tinyurl.com/3wajw6x2.

[10] *Geosyntec Alternatives Analysis* 37 (summarizing Lindgren & Ransome, *supra* n.4).

[11] *Geosytec Alternatives Analysis* 39-40.

18

fluoride.[12]

57.    Similarly, effluent toxicity testing shows that the water flowing from the Carlton Tunnel into Fourmile Creek is comparable to water elsewhere in the region. And although the results of certain Whole Effluent Toxicity ("WET") tests have indicated poor reproduction of *Ceriodaphnia dubia* (a species of water flea), that testing does not correlate with negative downstream impairment of fish and macroinvertebrate populations. Based on monitoring of ecological data on fish and macroinvertebrate populations in Fourmile Creek since the 1990s, aquatic life downstream from the Carlton Portal is as healthy or more healthy than upstream aquatic life.[13]

### C.    The Division has Sought to Require Compliance with Increasingly Burdensome Discharge Permit Conditions

58.    Since 1977, the Division has required a permit for flows from the Carlton Tunnel (Permit No. CO-0024562) and has issued discharge permits pursuant to its authority under the Clean Water Act and Colorado Water Quality Control Act. Historically, those permits included only basic sampling, monitoring, and reporting requirements.[14]

59.    In January 2021, the Division issued the current permit to CC&V.[15] It is entirely different in character from prior permits. For the first time, the Division imposed stringent effluent

---

[12] *Geosytec Alternatives Analysis* 40.

[13] *See Geosytec Alternatives Analysis* 25; *see also Sierra Club*, 2006 WL 2882491, at *4 (noting that there was "no evidence that a pattern of toxicity ever developed or the 'chronic lethality limitation' was ever exceeded" for Carlton Tunnel outflows).

[14] *See, e.g.*, CDPS Permit No. CO0024562, dated Oct. 22, 2009, *available at* https://tinyurl.com/4fxyhaav; CDPS Permit No. CO0024562, dated Sept. 26, 2006, *available at* https://tinyurl.com/44tkfabd.

[15] Exhibit A, *2021 Renewal Permit*.

limits on several constituents including total recoverable aluminum, dissolved iron, total recoverable iron, dissolved manganese, potentially dissolved manganese, arsenic, fluoride, and sulfate, all of which are naturally occurring. The Division's renewal permit also for the first time included requirements to conduct chronic WET testing. The permit initially required compliance with the new limits by 2024.

60.     The current permit issued by the Division for water discharged from the Carlton Tunnel is held by CC&V. As Plaintiffs have explained to the Division, before now Plaintiffs did not challenge the permit "because it was essentially a monitor only permit that was not onerous from a data collection perspective," but Plaintiffs have never conceded that a permit was required, have made clear that pollutants have not been added into Fourmile Creek, and have consistently reserved the right to challenge the need for a discharge permit if necessary.[16]

61.     In light of the new and onerous requirements in the 2021 permit, in February 2021, CC&V filed an administrative challenge to the conditions in the renewed permit.[17] Several lawsuits were also filed in Colorado state court seeking a stay of the permit conditions and judicial review of the Division's actions.[18]

62.     In December 2021, the lawsuits were settled. Under the settlement agreement, Plaintiffs agreed to investigate treatment options for the constituents identified by the Division,

---

[16] Exhibit B, *2021 Fact Sheet* 24-32 (CC&V Comments); *see id.* at 31 ("CCV has never conceded that the flow exiting the Carlton Tunnel or Fourmile Creek Springs require a discharge permit.").

[17] Notice of Appeal, Request for Adjudicatory Hearing, and Request for Stay, *In the Matter of CDPS Permit No. CO0024562 (Renewal Permit and Permit Modification), and CO0046540 (Renewal Permit and Permit Modification)* (Colo. Water Quality Control Comm'n).

[18] *CC&V v. Opila et al.*, No. 2021CV30007 (Colo. Dist. Ct. Teller Cnty.) (consolidated with Case Nos. 2021CV30008, 2021CV30036, 2021CV30037).

and the Division agreed to extend the compliance deadlines for the new effluent limits and WET testing requirement to 2027.[19] The right to challenge the need for a discharge permit was expressly reserved.[20] Plaintiffs continued to work in good faith with the Division to agree to modifications to the permit that would render compliance feasible.

63.    After investigating treatment options, Plaintiffs concluded that there is no viable option to treat Carlton Tunnel water to comply with all of the new effluent limits. Accordingly, in July 2023, Plaintiffs applied for a modification of CC&V's permit.[21] In June 2024, the Division denied the application.[22] The Division advised Plaintiffs to ask the Colorado Water Quality Control Commission ("Commission") for a discharger specific variance from water quality standards in the permit, and Plaintiffs thereafter did so.[23] The Division did not support Plaintiffs' proposed variance.[24]

64.    As part of continued efforts to work with the Division, Plaintiffs then amended its

---

[19] Settlement Agreement, *CC&V v. Opila, et al.* and *In the matter of CDPS Permit No. CO0024562 & CO0046540* (Dec. 17, 2021), *available at* https://tinyurl.com/4p6vveb6 (hereinafter *2021 Settlement Agreement*).

[20] *See, e.g., 2021 Settlement Agreement* ¶¶ 32, 58 ("The Parties agree that nothing in this Agreement means that CC&V is waiving its claim that a discharge permit is not required for the Carlton Tunnel.").

[21] Proponent Prehearing Statement of CC&V Exhibit 31 Attachment (Compliance Schedule Extension Request, CC&V Carlton Tunnel), 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Feb. 19, 2025).

[22] Proponent Prehearing Statement of CC&V Exhibit 7b (Letter From Erin Scott, Colo. Dep't of Pub. Health & Env't, to CC&V, Re: Denial of Permit Modification Request, Carlton Tunnel Portal Site, Permit No: CO0024562 (June 27, 2024), 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Feb. 19, 2025), *available at* https://tinyurl.com/3an4rfa5.

[23] *See* Proponent Prehearing Statement of CC&V, 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Feb. 19, 2025), *available at* https://tinyurl.com/3wajw6x2.

[24] *See* Responsive Prehearing Statement of the Water Quality Control Division, 2025 Reg. Nos. 32-38 RMH (Colo. Water Quality Control Comm'n Apr. 2, 2025), *available at* https://tinyurl.com/3wajw6x2.

variance request.[25] Plaintiffs maintained the position that a discharge permit is not required for the Carlton Tunnel.[26]

65.    In support of the amended discharge specific variance request, Plaintiffs demonstrated that the water quality of Fourmile Creek downstream of the Carlton Tunnel has neither adversely impacted the safety of drinking water supplies nor impaired the populations of fish and macroinvertebrate life.

66.    Plaintiffs also demonstrated that the remote location of the Carlton Portal and the characteristics of the water flowing from the Tunnel make it potentially infeasible to comply with the permit conditions.

67.    The water's relatively high flow and mineral content necessitate an advanced water treatment facility to comply with the effluent limits imposed by the permit. Plaintiffs' studies indicate in particular that only a water treatment plant implementing reverse osmosis can meet permit limits on WET, fluoride, and total recoverable arsenic.

68.    The Division has acknowledged that construction of an advanced water treatment facility at the location of the Carlton Portal is not feasible. The Carlton Portal is accessible only by Shelf Road—a narrow, steep, unpaved road constructed as a stagecoach route in the 1890s that has not been improved to modern standards. Shelf Road cannot safely be used to transport the heavy machinery, chemicals, and waste that would be needed to construct and operate an advanced

---

[25] Rebuttal of CC&V, 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Apr. 30, 2025), *available at* https://tinyurl.com/3wajw6x2 (hereinafter *Rebuttal*).

[26] *Rebuttal* 1 ("CC&V continues to work toward solutions to the infeasible limitations included in the 2021 renewal permit for the Carlton Tunnel, without conceding that the flow from the Carlton Tunnel requires a discharge permit.").

water treatment facility at the Carlton Portal. That is especially the case in winter months when Shelf Road frequently becomes impassible. As such, Teller County has indicated that it will not approve Shelf Road for such industrial uses.[27] Industrial uses also conflict with Shelf Road's designation as a scenic and historic byway. The lands surrounding Shelf Road are subject to conservation easements and likewise cannot be developed for industrial uses.

69.    Thus, to comply with the Division's requirements, a water treatment facility would have to be constructed at the site of surface-mining operations miles away from the Portal. A large volume of water would have to be pumped from the Carlton Tunnel to the remote surface-mining site for it to be treated there, and subsequently would have to discharge the treated water to Fourmile Creek (or a tributary to Fourmile Creek) at an alternative location upstream from the Portal. A bulkhead in the Carlton Tunnel would have to be constructed, and a borehole allowing for pumping water to the water treatment facility, but it is not known whether the Carlton Tunnel is structurally sound enough to support construction of the required bulkhead and borehole. There would need to be a way to access to the Carlton Tunnel, and the partial tunnel collapse would need to be cleared, even to investigate the structural integrity of the Tunnel. The construction of a bulkhead, even if it could be completed, may create new seeps and springs.

70.    Because this approach requires diversion of water from the Carlton Portal to a new discharge location upstream, it would interfere with senior water rights downstream of the Portal. That potentially would require a replacement water supply to downstream users, but the large

---

[27] *See* Proponent Prehearing Statement of CC&V Exhibit 14 (Feb. 18, 2025 Letter from Teller County Board of County Commissioners to CC&V), 2025 Reg. 32 RMH (Colo. Water Quality Control Comm'n Feb. 19, 2025) (hereinafter Feb. 18, 2025 Teller Cnty. Letter), *available at* https://tinyurl.com/3wajw6x2.

amount of replacement water that would need to be delivered may be unavailable. Accordingly, downstream users' exercise of their water rights would likely be impaired by any action taken to comply with the permit requirements.

71.    In short, doing the work to construct and operate the water treatment facility that would be required to comply with the permit may not even be possible, and in any event the efforts would cost many tens of millions of dollars and would dramatically impact downstream water rights and usage.

72.    Following a hearing on the variance application on June 9-10, 2025, the Commission adopted some of the site-specific standards and variances Plaintiffs proposed and rejected others, including the proposed variance for WET limitations.[28] Plaintiffs then filed an application with the Division for a permit modification that, among other things, would modify its permit to reflect the new site-specific standards for sulfate and dissolved manganese, modify the discharger specific variance for fluoride, and extend the compliance schedule for WET, arsenic, manganese, iron, and aluminum. On January 29, 2026, the Division issued a permit modification implementing some (but not all) of the changes requested by Plaintiffs. On February 25, 2026, the Division issued the currently operative corrected permit modification.[29]

73.    Following the Division's issuance of the permit modification, compliance with the discharge permit for the Carlton Tunnel remains unreasonably burdensome, if possible at all. An

---

[28] The final action documents approved by the Commission are available at https://tinyurl.com/3wajw6x2. *See* Attachment to Permit Modification Application for a Compliance Schedule Extension, CPDS Permit # CO-0024562 (June 23, 2025) (hereinafter *CC&V June 2025 Permit Modification Application*).

[29] Exhibit C, *2026 Permit Modification*. The corrected permit modification included corrections for several typographical errors in the initially issued permit modification. *See* Exhibit E.

advanced water treatment facility implementing reverse osmosis still would have to be constructed to comply with WET limitations and effluent limits for fluoride and total recoverable arsenic. Moreover, Plaintiffs inevitably will have to continue negotiating with the Division over the schedule for compliance with the permit.

74.    The State could seek penalties (currently up to $65,544 per day per violation) through an enforcement action or Clean Water Act citizen suit for failure to comply with a required discharge permit. *See* 33 U.S.C. § 1365(a)(1); Colo. Rev. Stat. §§ 25-8-602, 25-8-608 to 609; 5 Colo. Code Regs. § 1002-101:101.3.

75.    Plaintiffs have consistently reserved the right to challenge the Division's requirement of any discharge permit for the Carlton Tunnel and Portal.[30] This action is not a collateral challenge to the terms of the permit. Rather, Plaintiffs seek a declaratory judgment on whether federal and state law require *any* permit for water flows from the Carlton Tunnel and Portal. Absent declaratory relief, Plaintiffs will unjustifiably be subject to substantial compliance costs.

76.    Plaintiffs therefore bring this action to challenge whether the Division may lawfully

---

[30] *See, e.g.*, *Rebuttal* 1 ("CC&V continues to work toward solutions to the infeasible limitations included in the 2021 renewal permit for the Carlton Tunnel, without conceding that the flow from the Carlton Tunnel requires a discharge permit."); *2021 Settlement Agreement* ¶¶ 32, 58 ("The Parties agree that nothing in this Agreement means that CC&V is waiving its claim that a discharge permit is not required for the Carlton Tunnel."); Exhibit B, *2021 Fact Sheet* 31 ("CCV has never conceded that the flow exiting the Carlton Tunnel … require[s] a discharge permit."); Colorado Water Quality Control Division, Administrative Order on Consent ¶ 50 (Feb. 10, 2003), *available at* https://tinyurl.com/etcn87t6 ("Respondents [including CC&V] reserve, and this Order is without prejudice to, Respondents' right to contest . . . whether a discharge permit is required for the seeps below the Carlton Tunnel Ponds"); *see also Sierra Club*, 2006 WL 2882491, at *3 ("The settlement agreements allow CC&V to reserve the right to challenge whether a permit was required for the water flowing below the Carlton Tunnel ponds").

require a discharge permit for the Carlton Tunnel.

## CLAIMS

### COUNT ONE:
### Declaratory Judgment That Federal Law Does Not Require
### a Discharge Permit for the Carlton Tunnel Outflow

77.     Plaintiffs reallege and incorporate by reference herein the foregoing allegations.

78.     Pursuant to its delegated authority under the Clean Water Act, the Division has required a NPDES permit for outflows from the Carlton Tunnel to Fourmile Creek.

79.     However, the Division has no right to require a permit for the Carlton Tunnel because the outflows from the Carlton Tunnel to Fourmile Creek do not add pollutants to the waters of the United States from a point source. Therefore, the outflows are not subject to regulation under the Clean Water Act. *See* 33 U.S.C. §§ 1311, 1362(12). Those outflows are not regulated under the Clean Water Act for at least three independent reasons.

80.     *First*, under the Clean Water Act and the EPA's Water Transfers Rule, there is no "addition" of pollutants to the waters of the United States where pollutants are transferred between the waters of the United States. 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.3(i); 73 Fed. Reg. at 33708.

81.     The Carlton Tunnel qualifies as waters of the United States. Specifically, the Carlton Tunnel is an underground stream and a tributary to Fourmile Creek that has conveyed water to Fourmile Creek for over 80 years. Such relatively permanent tributaries of waters of the United States are themselves waters of the United States. *See* 40 C.F.R. § 120.2(a)(3). The Carlton Tunnel extends 6.5 miles, carries a substantial flow of water averaging approximately 1,200 gallons per minute, and significantly contributes to the flow of Fourmile Creek. Those features

distinguish the Carlton Tunnel from mere groundwater that does not qualify as waters of the United States. *See, e.g.*, Revised Definition of "Waters of the United States," 88 Fed. Reg. 3004, 3083 (Jan. 18, 2023) ("Underground streams are distinct from groundwater due to their very direct hydrologic connection to the portions of the tributaries that are or re-surface above ground. Typically, groundwater connections would be much slower than connections via underground streams. Tributaries that have been rerouted underground are contained within a tunnel system or other similar channelized subsurface feature . . . .").

82.    Man-made tributaries like Carlton Tunnel may qualify as waters of the United States. *See, e.g.*, 88 Fed. Reg. at 3080 (explaining that tributaries may be "natural, modified, or constructed waters" and that the definition of "'navigable waters,' does not turn on any such distinctions, which have no bearing on a tributary's capacity to carry water (and pollutants) to [other] waters").

83.    The outflow of water from the Carlton Tunnel to Fourmile Creek *via* the Portal is thus a water transfer under the Clean Water Act.

84.    The exemption to NPDES permitting requirements under EPA's Water Transfers Rule applies because the outflow at the Carlton Portal "conveys or connects waters of the United States without subjecting the transferred water to intervening industrial, municipal, or commercial use," and because no pollutant is "introduced by the water transfer activity itself to the water being transferred." 40 C.F.R. § 122.3(i). No person or entity subjects the water in the Carlton Tunnel to any intervening use. Moreover, no pollutants are introduced to the water by the transfer of water from Carlton Tunnel to Fourmile Creek.

85.    Because the discharge from the Carlton Tunnel to Fourmile Creek qualifies as a

water transfer, any pollutants in Carlton Tunnel that flow into Fourmile Creek at the Carlton Portal are not an "addition" of pollutants to the waters of the United States. That is because "nothing is being added 'to' 'the waters of the United States' by virtue of the water transfer" conveying or connecting waters of the United States. 73 Fed. Reg. at 33701. Rather, any "pollutant at issue [was] already part of 'the waters of the United States' to begin with." *Id.* The outflows from the Carlton Tunnel to Fourmile Creek therefore are not subject to the Clean Water Act's permitting requirements.

86.    *Second*, there is also no "addition" of pollutants to the waters of the United States—and thus no NPDES permit is required—where the presence of the pollutants is naturally occurring and has not been caused by human action. *See, e.g.*, *Sierra Club*, 2006 WL 2882491, at *16.

87.    Here, the constituents identified by the Division in the water emptying from the Carlton Tunnel to Fourmile Creek are naturally occurring as a result of the geology of the area where the Carlton Tunnel is located. Those constituents were not added to the water through any action by any person or entity. Those constituents include aluminum, iron, manganese, fluoride, sulfate, and arsenic. Those constituents are present in the Carlton Tunnel water as a result of natural processes of oxidation acting on rocks and minerals that are naturally occurring in the volcanic diatreme from which the Carlton Tunnel flows. Further, no person or entity exercises control over the flow of water through the Carlton Tunnel and into Fourmile Creek. There is also no evidence of any increase in the amount of the above constituents in Fourmile Creek as a result of any action by any person or entity. To the contrary, studies cited by the Division confirm that surface mining activities from 1994 to the present have not had any effect on the quality of the water in Carlton Tunnel.

88.     Because the presence of alleged pollutants in the outflows from the Carlton Tunnel is naturally occurring and was not caused by human action, there is no human "addition" of pollutants to waters of the United States. For that reason, too, the outflows from the Carlton Tunnel to Fourmile Creek are not subject to the Clean Water Act's permitting requirements.

89.     *Third*, the underground water in the diatreme would reach Fourmile Creek even if the Carlton Tunnel had never been built. Because up to four cubic feet per second of water flowing through Carlton Tunnel may have naturally flowed to Fourmile Creek before the Tunnel was constructed, the Carlton Tunnel does not cause an "addition" of pollutants to the waters of the United States. *See Miccosukee Tribe of Indians*, 541 U.S. at 109. Accordingly, the outflows from the Carlton Tunnel to Fourmile Creek are not subject to the Clean Water Act's permitting requirements.

90.     A real and justiciable controversy exists between the parties over whether a NPDES permit is required for flows from the Carlton Tunnel to Fourmile Creek. A declaratory judgment will advance the purposes of the Declaratory Judgment Act by resolving that controversy.

**COUNT TWO:**
**Declaratory Judgment That Colorado Law Does Not Require**
**a Discharge Permit for the Carlton Tunnel Outflow**

91.     Plaintiffs reallege and incorporate by reference herein the foregoing allegations.

92.     Pursuant to its authority under the Colorado Water Quality Control Act, the Division has required a CDPS permit for outflows from the Carlton Tunnel to Fourmile Creek.

93.     But Colorado law does not require a permit for outflows from the Carlton Tunnel. The Colorado Water Quality Control Act does not require a CDPS permit for three independent reasons.

29

94.    *First*, water transfers are exempt from permit requirements under the Colorado Water Quality Control Act. The Colorado Water Quality Control Act requires a discharge permit only when there is an "introduction or addition of a pollutant" to state waters. Colo. Rev. Stat. § 25-8-103(3). But there is no introduction or addition of a pollutant to state waters when, as here, there is simply a transfer between state waters. Moreover, under the Colorado Water Quality Control Act, a "diversion, carriage, and exchange of water from or into streams, lakes, reservoirs, or conveyance structures . . . in the exercise of water rights" is not a regulated "point source discharge[] of pollution." Colo. Rev. Stat. § 25-8-503(5). As the Carlton Tunnel is an underground stream, the "diversion, carriage, [or] exchange of water from" the Carlton Tunnel "into" Fourmile Creek is not a "point source discharge[] of pollution" under Colorado law (especially when the outflows from the Carlton Tunnel are necessary to the exercise of senior water rights by downstream users). *Id*. For those reasons, outflows from the Carlton Tunnel to Fourmile Creek are not subject to the Colorado Water Quality Control Act's permitting requirement and a CDPS permit.

95.    *Second*, the outflows from the Carlton Tunnel do not involve any "introduction or addition of a pollutant" to state waters (Colo. Rev. Stat. § 25-8-103(3)), because human action has not caused the presence of any pollutant. The constituents in the water emptying from the Carlton Tunnel to Fourmile Creek that the Division identified are naturally occurring as a result of the geology of the area where the Carlton Tunnel is located. Those constituents have not been added to the water through any action by any person or entity. Rather, they are present in the Carlton Tunnel water as a result of natural processes of oxidation acting on rocks and minerals that are naturally occurring in the volcanic diatreme from which the Carlton Tunnel flows. Further, no

person or entity exercises control over the flow of water through the Carlton Tunnel and into Fourmile Creek. There is also no evidence of any increase in the concentrations of the above constituents in Fourmile Creek as a result of any action by any person or entity. To the contrary, studies cited by the Division confirm that surface mining activities from 1994 to the present have not had any effect on the quality of the water in Carlton Tunnel. Because the presence of alleged pollutants in the outflows from the Carlton Tunnel is naturally occurring and was not caused by human action, there is no "addition" of pollutants to state waters. The outflows from the Carlton Tunnel to Fourmile Creek therefore are not subject to the Colorado Water Quality Control Act's permitting requirements.

96.     *Third*, the underground water in the diatreme would reach Fourmile Creek even if the Carlton Tunnel had never been built. Because up to four cubic feet per second of water flowing through Carlton Tunnel may have naturally flowed to Fourmile Creek before the Tunnel was constructed, the Carlton Tunnel does not cause an "addition" of pollutants to state waters. For that reason, too, the outflows from the Carlton Tunnel to Fourmile Creek are not subject to the Colorado Water Quality Control Act's permitting requirements.

97.     A real and justiciable controversy exists between the parties over whether a CDPS permit is required for discharges from the Carlton Tunnel to Fourmile Creek. A declaratory judgment will advance the purposes of the Declaratory Judgment Act by resolving that controversy.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

A.     A declaratory judgment, pursuant to 28 U.S.C. § 2201, that:

       (i)     federal law does not require a discharge permit for the Carlton Tunnel outflow;

       (ii)    Colorado law does not require a discharge permit for the Carlton Tunnel outflow.

B.    Such other relief as the Court may deem just and proper.

DATED: March 9, 2026

*/s/ Timothy S. Bishop*
Michael A. Olsen
Timothy S. Bishop
Avi M. Kupfer
Christopher J. Ferro
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606
(312) 782-0600
molsen@mayerbrown.com
tbishop@mayerbrown.com
akupfer@mayerbrown.com
cferro@mayerbrown.com

*Attorneys for Newmont Corporation*

*/s/ Emily Westridge Black*
Emily Westridge Black
William D. Marsh, Jr.
Allen Overy Shearman Sterling US LLP
300 West 6th Street, Suite 2250
Austin TX 78701
(512) 647-1900
emily.westridgeblack@aoshearman.com
billy.marsh@aoshearman.com

*Attorneys for Cripple Creek & Victor Gold Mining Company LLC*